**Slip Op. 01-58**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

_____

USEC, INC. and UNITED STATES
ENRICHMENT CORPORATION,                    :

              Plaintiffs,                    :

                                        :

         v.                    :

THE UNITED STATES,

                                          :      Court No. 99-08-00548

              Defendant,                    :

                   and                    :

THE GOVERNMENT OF                    :
KAZAKHSTAN,
NATIONAL ATOMIC COMPANY                    :
KAZATOMPROM, and NUKEM, INC.,

                              :

              Defendant-Intervenors.

_____

[Plaintiffs' motion for judgment upon the agency record denied.]        Decided: May 17, 2001

*Steptoe & Johnson LLP, Richard O. Cunningham, Sheldon E. Hochberg, Eric C. Emerson, (Amy Howe),* for Plaintiffs.

*David W. Ogden,* Assistant Attorney General, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division (*Velta A. Melnbrencis); David R. Mason*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

*Shearman & Sterling LLP, (Thomas B. Wilner)*, for Defendant-Intervenors the Republic of Kazakhstan and the National Atomic Company Kazatomprom.

*White & Case LLP, (Carolyn B. Lamm), Adams C. Lee,* for Defendant-Intervenor NUKEM, Inc.

**OPINION**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

This case continues the dispute regarding the importation of uranium from Kazakstan into the United States.  In the initial litigation, Plaintiffs, domestic uranium producers, challenged the United States International Trade Commission's ("ITC" or "Commission") final negative determination in *Uranium from Kazakhstan*, 64 Fed. Reg. 40897 (July 28, 1999), in which the Commission ascertained that uranium imported from Kazakhstan caused neither material injury nor threat of material injury to the domestic uranium industry.  *See USEC, Inc. v. United States,* 25 CIT ___, 132 F. Supp.2d 1 (2001) ("*USEC I*").  In *USEC I,*  the court denied Plaintiffs' *Motions for Judgment Upon the Agency Record* and upheld the Commission's negative determination regarding uranium from Kazakhstan.  Familiarity with that opinion is presumed.

Now before the court is Plaintiffs' challenge to Defendant's ("Department" or "Commerce") *Final Determination of Sales at Less Than Fair Value: Uranium from the Republic of Kazakhstan*, 64 Fed. Reg. 31179 (June 10, 1999) ("*Final LTFV Determination*").  Plaintiffs claim that the Department erred in two ways: (1) Commerce did not address the issue of whether Kazakh-origin natural uranium enriched in a third country prior to importation into the United States was included within the scope of the investigation, and (2) Commerce decided that Kazakh-origin uranium imported into the United States for processing and re-export under temporary importations in bond ("TIB") did not constitute entries for purposes of the antidumping duty order.  *See Mem. of Pls. USEC Inc. and United States Enrichment Corp. in Supp. of Their R. 56.2 Mot. for J. on the Agency R.*

("*Pls.' Mem.*") at 1-2.  For the reasons that follow, the court denies Plaintiffs' motion for judgment upon the agency record.

## II. BACKGROUND

On November 8, 1991, the Ad Hoc Committee of Domestic Uranium Producers and the Oil, Chemical and Atomic Workers International Union ("Ad Hoc") filed a petition against imports of uranium from the Soviet Union sold in the United States, alleging that the uranium had been sold at less than fair value ("LTFV").[1]  Shortly thereafter, the Soviet Union dissolved and the case was continued, involving six of the newly independent states ("NIS").

The Government of Kazakhstan ("GOK" or "Kazakstan"), a non-market economy, and Commerce signed a suspension agreement on October 16, 1992, pursuant to 19 U.S.C. §1673c(c)(1)(1993).[2]  *See Antidumping; Uranium from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine and Uzbekistan; Suspension of Investigations and Amendment of Preliminary Determinations*, (*"Suspension Agreement"* or *"Kazakh Suspension Agreement"*) 57

---

[1]19 C.F.R. § 353.12 (a)(1997) provides that an interested party may file on behalf of an industry:

> a petition . . . requesting the imposition of antidumping duties equal to the alleged amount of the dumping margin, if that person has reason to believe that:
>
> (1)     The merchandise is being, or is likely to be, sold at less than fair value; and
> (2)     That industry is materially injured, is threatened with material injury, or its establishment is materially retarded by the merchandise.

[2]Section 734 (l) of the Tariff Act of 1930, 19 U.S.C. §1673c(c)(1), allows the ITA to reach an agreement with a nonmarket economy country to restrict the volume of subject imports when such an agreement will prevent suppression and undercutting of the price of domestic products.

Fed. Reg. 49,220 (Oct. 30, 1992). "Under the terms of the agreement, Kazakstan was permitted to:

(a) ship limited amounts of uranium pursuant to pre-existing contracts; (b) bring uranium into the United

States temporarily for processing and then re-export the uranium to third countries; and (c) export a

limited quantity of uranium to the United States under a price-tiered quota." *USEC I*, 25 CIT at ___,

132 F. Supp. 2d at 3. The *Suspension Agreement* specifically noted, "[f]or purposes of this

Agreement, uranium enriched in $U^{235}$ in another country prior to direct and/or indirect importation into

the United States is not considered uranium from Kazakhstan and is not subject to the terms of this

Agreement." 57 Fed. Reg. at 49222. The ITC then suspended its investigation of uranium from

Kazakhstan.[3] The *Kazakh Suspension Agreement* was amended several times over the next several

years. One amendment, signed by both the Department and the GOK on March 27, 1995, redefined

"Kazakhstan-origin uranium" to include uranium that was mined in Kazakhstan and enriched in a third

country. *See Agreement Suspending the Antidumping Investigation on Uranium From*

*Kazakhstan,* 60 Fed. Reg. 25,692 (May 12, 1995).[4]

In 1998, the terms of the *Suspension Agreement* became economically infeasible for

Kazakstan. After attempting to negotiate another amendment, the GOK filed its termination request on

November 10, 1998, and on January 11, 1999, the termination became effective. Commerce and the

---

[3]The Department also signed suspension agreements with the other five NIS with respect to which it had made preliminary affirmative LTFV determinations. *See Pls.' Mem.* at 5. The Department terminated its investigation of the remaining six NIS, as there were no LTFV sales from those states. *See id.*

[4]Plaintiffs refer to the uranium mined in Kazakhstan and enriched in a third country as "by-pass material," and Defendant refers to such uranium as "third-country enriched uranium." The court uses these terms interchangeably.

ITC then resumed their investigations of imports of Kazakh uranium. In its notice regarding resumption of the investigation, Commerce indicated that the scope of the investigation included "uranium enriched in $U^{235}$ and its compounds." *See Termination of Suspension Agreement, Resumption of Antidumping Investigation, and Termination of Administrative Review on Uranium from Kazakhstan*, 64 Fed. Reg. 2877, 2878 (Jan. 19, 1999). On April 26, 1999, the Uranium Coalition ("Coalition"), including USEC, Ad Hoc, and the Paper, Allied-Industrial, Chemical & Energy Workers International Union, filed a request for scope clarification, asking that Commerce ascertain that the scope of the resumed investigation included uranium enriched in other countries that had been added to the scope of the *Suspension Agreement* by amendment. Both parties addressed the issue of third-country enriched uranium in their briefs to the Department prior to its *Final LTFV Determination*. Additionally, the Coalition asked the Department to include uranium entered under a TIB within the scope of the resumed investigation and any antidumping duty order. On June 10, 1999, Commerce published its *Final LTFV Determination*, affirming that sales of uranium from Kazakhstan had been made at LTFV at a margin of 115.82 percent. *See* 64 Fed. Reg. at 31184.[5] In its *Final LTFV Determination*, the Department opted not to decide the by-pass or third-country enriched uranium issue, and rejected the Coalition's request to include Kazakhstan-origin uranium entered under TIB within the scope of the proceeding. *See id* at 31185.

On July 23, 1999, the ITC issued its negative final material injury and threat of material injury

---

[5] The margin rate was derived from the average of the underselling alleged in the petition. *See id.* at 31184.

determination. *See Uranium from Kazakhstan*, USITC Pub. 3213, Inv. No. 731-TA-539-A (Final) (July 1999) ("*Final Determination*"). USEC and Ad Hoc challenged that determination before the court, seeking a reversal of the Commission's determination that Kazakh uranium neither caused nor threatened material injury to the domestic uranium industry. *See USEC I*, 25 CIT at ___, 132 F. Supp. at 2. The court denied the plaintiffs' motions for judgment upon the agency record and upheld the ITC's *Final Determination* as supported by substantial evidence and in accordance with law. *See id*. The court now addresses whether the Department erred in its *Final LTFV Determination*.[6]

### III. STANDARD OF REVIEW

Plaintiffs ask the court to hold that Commerce's *Final LTFV Determination* is unlawful. The court must evaluate whether the finding in question is supported by substantial evidence on the record and is otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(1994). Substantial evidence is "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," "even if there is some evidence that detracts from the agency's conclusions." *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)*; Matsushita Elec. Indus. Co., Ltd. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984); *Olympia Indus., Inc. v. United States*, 22 CIT ___, ___, 7 F. Supp.2d 997, 1000 (1998) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1556, 1563 (Fed. Cir. 1984).

The court may not reweigh the evidence or substitute its own judgment for that of the agency.

---

[6]Plaintiffs filed a motion to stay proceedings in this case pending resolution of *USEC I*, claiming that USEC's challenges to certain aspects of the Department's determination were relevant only if USEC prevailed in the ITC litigation. The court denied Plaintiffs' motion.

*See Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from

being supported by substantial evidence." *Id.*, 13 CIT at 475, 716 F. Supp. at 21(citations omitted).

Additionally, absent a showing to the contrary, the agency is presumed to have considered all of the

evidence in the record. *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696 F.

Supp. 642, 648 (1988). Thus, "to prevail under the substantial evidence standard, a plaintiff must show

either that the [agency] has made errors of law or that the [agency's] factual findings are not supported

by substantial evidence." *Id.*, 12 CIT at 774, 696 F. Supp. at 644.

## IV.  DISCUSSION

**A.      The Department Properly Exercised its Discretion in Determining that it Need Not Decide Whether By-Pass Material is Included Within the Scope of the Resumed Investigation.**

Plaintiffs make several arguments supporting their contention that the Department's failure to

determine the scope issue in this case is not in accordance with law. First, Plaintiffs refute the

Department's "reliance" on the late date of the Coalition's scope request, claiming that the submission

was timely and therefore not too late to warrant consideration. *Pls.' Mem.* at 12-13. Additionally,

Plaintiffs assert that failure to rule on a scope clarification request is "virtually unprecedented" and

contrary to Congressional intent. *See id.* at 16, 20. Finally, Plaintiffs attempt to distinguish this case

from the court's decision in *Smith Corona Corp. v. United States*, 16 CIT 562, 796 F. Supp. 1532

(1992), wherein the court denied the plaintiff's request to expand the scope of the investigation to

include parts of personal word processors.  None of Plaintiffs' arguments convinces the court that the

Department's decision to neither approve nor deny the scope request was not in accordance with law.

> 1.      *Plaintiffs' argument that Commerce relied on the date of scope request submission in refusing to determine the scope issues is unavailing.*

Plaintiffs first argue that the Coalition's request for a scope clarification was timely, even though

it was submitted only one week prior to verification, and that Commerce therefore cannot use this fact

as reason for declining to decide the scope issue.  Plaintiffs recite the requirement of 19 C.F.R. §

353.31(a)(1)(i)(1997) that factual information be submitted no later than seven days before verification

in order to warrant consideration in the final determination, and that the Coalition complied with that

requirement.[7]  Plaintiffs then claim that the Department "relied heavily on what it regarded as the

lateness of the Coalition's request for a scope clarification to justify its failure to rule on the request."

*Pls.' Mem.* at 12.  Plaintiffs attempt to analogize their case to *Al Tech Specialty Steel Corp. v. United

States*, wherein the court determined that the plaintiff "complied with the regulatory time limits. [The

Department] cannot apply these time limits arbitrarily or capriciously by refusing to accept information

submitted before the applicable deadline." 20 CIT 1344, 1353, 947 F. Supp. 510, 519 (1996).

Plaintiffs are correct that USEC's submission of the scope clarification request was indeed

timely under the regulations.  The court notes Plaintiffs' statement that if the deadline for submission of a

scope request "is insufficient for the ITA to consider new evidence and arguments, the solution is for the

---

[7]19 C.F.R. §353.31(a)(1)(i) provides: "[S]ubmissions of factual information for the Secretary's consideration shall be submitted not later than . . . seven days before the scheduled date on which the verification is to commence."

Department to amend its regulations, not punish parties that act in accordance with the existing rules." *See Pls.' Mem.* at 15. However, both in the *Final LTFV Determination* and in its brief to the court, Commerce states that the timing of the scope request was not the reason for its decision to reject the scope clarification request.

While the Department did note in its determination that the date of the filing did not permit adequate time for Commerce to "properly evaluate the law, arguments, and facts surrounding this issue," the Department also explained that it did not "rely heavily" on the lateness of the request to account for its failure to decide the scope issue. *Def.'s Mem. in Opp. to the Mot. of Pls. for J. Upon the Agency R.* ("*Def.'s Br.*") at 18 (quoting *Final LTFV Determination*, 64 Fed. Reg. at 31185). According to Commerce, the Department opted not to decide the scope issue because as it found no evidence indicating that by-pass uranium from Kazakhstan entered the United States during the period of investigation ("POI"), the Coalition's concern was unrelated to the calculation of a dumping margin on Kazakh uranium during the POI. *See Def.'s Br.* at 13. Resolution of the scope issue was therefore unnecessary. *See id.* "The fact that [*sic*] Coalition's request was submitted late in the investigation was simply an additional reason for declining to decide the issue during the investigation. . . ." *Id.* at 18. USEC does not refute Commerce's statement that the timing of Plaintiffs' scope request submission was not the determinative reason for its refusal to make the scope clarification. Plaintiffs have therefore failed to show that Commerce erred in this regard.

2.       *Plaintiffs' claim that Commerce's failure to render a scope clarification is unprecedented does not withstand scrutiny and does not render Commerce's Final LTFV Determination not in accordance with law.*

Plaintiffs next claim that the Department erred because it departed from precedent by deciding not to rule on the scope clarification request. USEC cites several instances wherein the Department has "consistently ruled" on such requests as part of its final LTFV determinations. *See Pls.' Mem.* at 16. Plaintiffs contend that while in most instances the Department has either granted or denied a party's request for clarification, the occasions in which "the Department has declined to rule on a scope request, but has instead offered to conduct a scope inquiry, have been extremely limited and are distinguishable from this case." *Id.* at 18.[8] Plaintiffs state that their "research uncovered no case in which a decision on a timely filed scope request was deferred by the Department." *Id*. at 19.

Plaintiffs fail to convince the court that Commerce's decision in this case not to rule on the scope issue is virtually unprecedented and therefore not in accordance with law. First, the Department

---

[8]USEC cites several ITA determinations in support of this proposition: (1) *Preliminary Determination of Sales at Less Than Fair Value: Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan*, 54 Fed. Reg. 5114 (Feb 1, 1989), in which the Department rejected a request to have a product excluded from the scope of a final investigation because the information received was insufficient to determine whether the merchandise was excludable from the scope of the investigation; (2) *Antidumping; Fuel Ethanol From Brazil; Final Determination of Sales at Less Than Fair Value*, 51 Fed. Reg. 5572 (Feb 14, 1986), in which the Department stated that a scope clarification would be premature at the time of the request; and (3) *Notice of Antidumping Duty Order in the Antidumping Investigation of Vector Supercomputers from Japan*, 62 Fed. Reg. 55, 392 (Oct. 24, 1997), wherein the Department did not rule on the scope request submitted the same day that the ITC's final determination was published in the Federal Register.

cites several Department determinations wherein Commerce decided to postpone ruling on a scope issue raised during an investigation, indicating that the Department did not break from precedent by declining to rule on the scope issue in this case.[9]  Second, even if Commerce were going against precedent in this instance by declining to rule on a timely-filed scope request, mere departure from precedent does not by itself show that the agency acted unreasonably and that its action was not in accordance with law.  Indeed, as both parties have acknowledged, Commerce may depart from prior practice so long as it explains its reason for doing so.  *See Pls.' Mem*. at 20, n. 50 (citing *Aimcor & SKW Metals & Alloys, Inc. v. United States*, 23 CIT ___, ___, 86 F. Supp. 2d 1248, 1254 (1999) ("Commerce may still depart from this practice so long as (a) it articulates its reason for doing so, and (b) its explanation is supported by substantial record evidence and is otherwise in accordance with law.")); *Def.'s Br*. at 21.  The court disagrees with Plaintiffs that there is an "absence of any such explanation." *Pls.' Mem.* at 20.  Rather, Commerce has adequately articulated its reasons for declining to rule on the scope issue.[10]

---

[9]*Final Determination of Sales at Less than Fair Value: Sparklers from the People's Republic of China*, 56 Fed. Reg. 20588 (May 6, 1991), wherein Commerce denied a request for modification because the moving party failed to provide adequate information as to why the scope should be modified; *Final Results of Antidumping Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan*, 58 *Fed. Reg.* 64720 (Dec. 3, 1993), wherein Commerce deferred its decision on a scope request because it found that there was no record evidence to support the assertion that the respondents had sold the merchandise during the period of review.

[10]*See* 64 Fed. Reg. at 31185.  As previously noted, Commerce did not decide the scope issue because it found no evidence that by-pass material entered the United States during the POI.  Hence, Commerce found that the Uranium Coalitions' concern was unrelated to the calculation of a dumping margin on Kazakh uranium during the POI.  *See supra subsection 3 of this section*.

3.      *Commerce did not contravene Congressional intent by refusing to decide the scope issue in this case.*

Plaintiffs argue that by refusing to decide the scope issue, the Department violated "Congressional intent that the Department issue a *final* decision." *Pls.' Mem*. at 20. In support of its contention, Plaintiffs cite *Koyo Seiko Co., Ltd. v. United States*, 14 CIT 680, 682, 746 F. Supp. 1108, 1110 (1990) (quoting *Badger-Powhatan, Division of Figgie Int'l Inc. v. United States*, 10 CIT 241, 245, 633 F. Supp. 1364, 1369 (1986)). In that case, the court stated that "Congress intended final determinations to be precisely that." *Id.* Plaintiffs go on to assert that the Department has only been permitted to "revisit the finality of its determinations to promote two other important goals: fairness and accuracy," and that the Department may rely on neither of these goals as reason for its failure to reach a determination in this case. *Pls.' Mem*. at 21. USEC states that the Department's actions were fundamentally unfair, as the scope request was timely submitted and both sides had the opportunity to present their arguments regarding the by-pass issue. *See id.* at 22. Additionally, Plaintiffs claim that accuracy is not promoted by failure to decide the scope issue, as the Department possessed all of the information necessary to make an accurate determination. *See id.* at 23-24.

Plaintiffs do not convince the court that the Department's failure to determine the scope issue is contrary to Congressional intent, and therefore do not show how the *Final LTFV Determination* was unreasonable and not in accordance with law. The statute does require Commerce to make a final determination of whether subject merchandise is being sold or is likely to be sold at LTFV. *See* 19 U.S.C. § 1673d(a)(1) (1994). However, as Commerce notes, the Department made a final determination with respect to uranium from Kazakhstan, but was not required to and therefore did not

make a final determination with respect to uranium enriched in a third country that was not definitively imported into the United States during the POI. *See Def.'s Br.* at 22. Thus, by not ruling on the instant scope clarification request, Commerce has not violated Congressional intent that it render final determinations with regard to sales at less than fair value.

The court agrees with Plaintiffs that the principle of finality may be outweighed by the public interests of fairness and accuracy. Yet, even if the court were to hold that the Department failed to adhere to Congress' intent that final determinations be final, the Department's actions were neither unfair nor inaccurate. Plaintiffs argue that it was fundamentally unfair for the Department not to rule on the scope issue, because the scope clarification request "was timely submitted and, as the Department itself points out, the by-pass issue was argued extensively on both sides." *Pls.' Mem*. at 22. However, the court is unaware of any regulation demanding that Commerce address scope questions merely because they have been raised and briefed. Plaintiffs further contend that the Department's promise to initiate a scope inquiry simultaneously with an antidumping duty order is unfair to the parties raising the scope question because it "raises the prospect that by-pass material could enter the United States free and clear of any import restrictions pending the outcome of the ITA's scope inquiry." *Pls.' Mem.* at 23. The court agrees with Defendant that Plaintiffs' argument is speculative. *See Def.'s Br.* at 23. It is not fundamentally unfair for the Department to refrain from making a scope clarification because of one potential outcome of its decision.

USEC further contends that because the Department possessed all of the information required to make an accurate determination, and did not need any additional information regarding by-pass material to calculate a dumping margin for a future antidumping duty order, its failure to rule on the

scope issue does not promote the alternative goal of accuracy and is therefore not in accordance with law. Yet, as the Department notes, Commerce's determination concerned imports of Kazakh-origin uranium into the United States during the POI, and "the accuracy of Commerce's findings as such has not been questioned." *Def.'s Br.* at 23. USEC does not challenge Commerce's statement that there were no entries of third-country enriched uranium during the POI. As Defendant-Intervenor NUKEM states, "[t]he Coalition's request was merely hypothetical and would have affected only entries of third-country enriched uranium made after the POI." *Defendant-Intervenor NUKEM Inc.'s Resp. Br. in Opp. to Pls.' Mots. For J. on the Agency R.* ("*NUKEM Br.*") at 20. The court does not agree that the Department's failure to rule on a scope clarification request concerning potential imports occurring after the POI fails to promote accuracy.[11] As Commerce's decision to defer its scope determination does not contravene the Congressional goals of finality, accuracy or fairness, the court holds that Commerce acted in accordance with law.

---

[11]In arguing this point, Plaintiffs attempt to distinguish this case from *Smith Corona Corp. v. United States*, 16 CIT 562, 796 F. Supp. 1532 (1992), where the court upheld Commerce's refusal to expand the scope of an investigation into word processors by including parts. Plaintiffs are correct that antidumping investigations are by necessity fact-specific and therefore *Smith Corona* may not control here. However, the rationale used by the court in *Smith Corona* does apply to the facts currently before the court:

> [T]he International Trade Commission ("ITC") must make its determination of like product and its determination of injury in relation to Commerce's definition of the class or kind of imported merchandise being investigated. Late changes in scope definitions can cause problems with this process and can even lead to unintended divergences from commitments pursuant to international obligations.

16 CIT at 565, 796 F. Supp. at 1535.

**B.      Commerce's rejection of the Coalition's Request to Include TIB Entries within the Scope of the Investigation and Any Resulting Antidumping Duty Order was Supported by Substantial Evidence and in Accordance with Law.**

USEC claims that the Department erred in deciding that Kazakh-origin uranium imported into the United States for processing and re-export under TIB did not constitute entries for the purposes of any antidumping duty order.  According to TIB regulations, articles brought into the United States temporarily may qualify for TIB entry without payment of duties if a bond is posted in an amount equal to twice the estimated duties, including any applicable antidumping duties, that would apply were the imported articles entered for consumption in the United States.  *See Pls.' Mem.* at 28.  The *Kazakh Suspension Agreement* provided that Kazakh-origin uranium could enter the United States for processing outside the import quotas imposed by the agreement "only where such imports to the United States are not for sale or ultimate consumption in the United States. . . ." 57 Fed. Reg. at 49223.  After resumption of the investigation, in addition to requesting a clarification that the scope of the investigation included by-pass material,

> [T]he Coalition asked the Department to include uranium imported under a U.S. Customs TIB within the scope of the investigation and any resulting antidumping duty order, or in the alternative, to direct U.S. Customs to consider any entry of Kazakhstan-origin uranium as a consumption entry subject to the antidumping order unless the "statement of use" accompanying the TIB application included a statement that the imported uranium will not be and has not been, used as part of any swap, loan, or exchange transaction.

*Pls.' Mem.* at 8.  In its *Final LTFV Determination*, Commerce excluded uranium imported under a TIB from the scope of the investigation, "reaffirm[ing] its prior finding that merchandise entered pursuant to TIB is not entered for consumption.  As a result, antidumping duties cannot apply to TIB entries." 64 Fed. Reg. at 31185.

Plaintiffs claim that the Department's rejection of the request to include Kazakh-origin uranium entered under TIB within the scope of the investigation was contrary to Congressional intent and therefore not in accordance with law. USEC makes several arguments in this regard: (1) that the "unique" aspects of the uranium market create the risk that TIB entries could be used to circumvent an antidumping duty order, and that the Department should have included imports entered under TIB within the scope of the investigation in order to avoid such circumvention of an antidumping duty order; and (2) that *Titanium Metals v. United States,* 19 CIT 1143, 901 F. Supp. 362 (1995), upon which the Department relied in its *Final LTFV Determination*, is distinguishable from this case. The court holds that Defendant's decision not to include TIB entries within the scope of the investigation is in accordance with law.

> 1.       *The fungible nature of uranium does not indicate that the Department's rejection of the Coalition's request was unreasonable and therefore not in accordance with law.*

Plaintiffs claim that while the nature of many articles imported under TIB may prevent importers from using the procedures to circumvent an antidumping duty order, the fungible quality of uranium allows importers to use TIB procedures to circumvent any antidumping order issued regarding uranium. *See Pls.' Mem*. at 29. USEC describes at some length the evolution of the practice of "swaps" in the uranium market. *See id.* at 28-29. First, Kazakhstan-origin uranium is imported into the United States under TIB procedures. *See id.* at 29. Then, the origin of that specific quantity of uranium is exchanged, or "swapped," for the origin of other uranium held by the processor. *See id.* Finally, the importer can re-export the "swapped" uranium pursuant to TIB requirements, even though the Kazakhstan-origin uranium actually entered under TIB requirements remains in the United States

without having faced any import restrictions. According to USEC, "[t]he importer thus creates a 'stockpile' of nominally non-Kazakhstan-origin uranium that it can then sell in the United States free of any import restrictions, even though this uranium was purchased at a dumped price." *Id.* As such, USEC claims, the importer "experiences the best of both worlds:" it can sell the Kazakh-origin uranium in the United States without paying antidumping duties, and does not have to forfeit the amount of the bond posted to ensure re-export under TIB procedures because the Kazakh-origin uranium was "ostensibly" re-exported. *Id.*

Plaintiffs claim that the fungible nature of uranium and the increased potential for swap transactions dictate that the Department failed to act in accordance with law when it rejected the Coalition's request to either include imports entered under TIB procedures within the scope of the investigation, or direct Customs that all entries of Kazakh-origin uranium should be considered entries for consumption subject to the antidumping duty order unless accompanied by the statement-of-use that the uranium has not been part of any swap transaction. *See id.* at 31. Plaintiffs reason that although the *Kazakh Suspension Agreement* imposed additional requirements upon importers of uranium from Kazakhstan, those requirements were insufficient to protect against abuse of TIB procedures. *See id.* First, the agreement contained a provision whereby Kazakh-origin uranium was permitted to enter the United States for processing only where not for sale or consumption in the United States. *See id.* at 29. Second, the Department limited the amount of uranium that could be in the United States at any given time and required a certification from the importer that the uranium would be re-exported within one year of entry and delivered to end-users outside of the United States. However, according to Plaintiffs, "[s]uch additional requirements would not be included as part of the TIB procedures if an antidumping

duty order were issued, thereby severely limiting the effectiveness of TIB procedures in preventing swaps." *Id.* at 30-31.

The court agrees with Defendant that the fungible nature of uranium does not demand that uranium entering the United States under TIB must be considered as entered for consumption. *See Def.'s Br.* at 26. . As Commerce states, "there are many fungible commodities, and the concerns expressed by USEC are clearly applicable to them as well. Congress has not chosen to provide that TIB entries are to be considered as entered for consumption merely because they cover fungible commodities or commodities that are the [*sic*] subject to antidumping investigations." *Id.* at 26. In the *Final LTFV Determination*, the Department "recognize[d] the Uranium Coalition's concerns regarding the atypical characteristics of uranium and the uranium industry," but correctly stated that the Department does not have the authority to apply antidumping duties to TIB entries, include TIB entries within the scope of an antidumping investigation, or require additional certification for Kazakhstan TIB entries as alternatively requested by the Coalition. 64 Fed. Reg. at 31185. Under current regulations, merchandise imported under TIB is not entered for consumption; therefore, antidumping duties cannot apply to such merchandise, and commodities imported under TIB are lawfully excluded from the scope of an antidumping investigation. *See generally* 19 C.F.R. § 10.31 (1999). The Department's rejection of the Coalition's request to either include TIB entries within the scope of the investigation or require an additional statement by the importer was therefore reasonable and in accordance with law.

2.     *The Department's reliance on* Titanium Metals *is in accordance with law.*

Plaintiffs next argue that *Titanium Metals,* upon which Commerce relied in rejecting the Coalition's request that Kazakh-origin uranium imported pursuant to TIB be included within the scope

of the investigation and any subsequent antidumping duty order, is distinguishable from this case. According to Plaintiffs, the facts of the case before the court, unlike those of *Titanium Metals*, compel a finding that the uranium imported into the United States through TIB procedures must be included within the scope of the antidumping duty investigation. To the contrary, the court finds that Defendant properly relied on *Titanium Metals*.

In *Titanium Metals*, TIMET, a domestic producer of titanium sponge, sought review of Commerce's decision not to direct Customs to collect antidumping duties on titanium sponge imports from Kazakhstan. *See* 19 CIT at 1144, 901 F. Supp. at 363. TIMET asserted two arguments: first, that uranium imported under TIB was "entered for consumption" within the meaning of the antidumping laws, because it underwent further processing and manufacturing, essentially becoming a new product before re-export, and second, that Commerce's determination was contrary to legislative intent, because it allowed importers to circumvent antidumping duty orders. *See id.*, 19 CIT at 1144-1145, 901 F. Supp. at 363-364. The court first examined the relevant statutory language, finding it "clear that the assessment of AD/CV duties is restricted to merchandise 'entered, or withdrawn from warehouse, for consumption.'" *Id.*, 19 CIT at 1145, 901 F. Supp. at 364 (citations omitted). The court also noted that the legislative history of the antidumping duty law does not define the phrase "entered, or withdrawn from warehouse, for consumption." *Id.,* 19 CIT at 1146*,* 901 F. Supp. at 364-365. Thus, the court held, "the term 'entered for consumption' under the AD/CV duty laws is, at least, ambiguous and the court will not infer legislative intent in derogation of the reasonable interpretation of Commerce." *Id.*, 19 CIT at 1148, 901 F. Supp. at 366. Regarding TIMET's first argument, the court held that TIB entries are not entries for consumption because they are temporary, and the fact that the articles are

manufactured and processed in the United States does not render them entered for consumption. *See id.*, 19 CIT at 1147, 901 F.. Supp. at 366.  Second, responding to TIMET's argument regarding circumvention of antidumping duties, the court noted that "[p]otential for circumvention is relevant, but only to the extent that it relates to statutory interpretation. . . .  The court finds that Commerce and Customs' treatment of TIB entries as not entered for consumption, for purposes of AD/CV duty laws, is reasonable and not contrary to the legislative intent of the statute." *Id.*, 19 CIT at 1148, 901 F. Supp. at 366-367 (citations omitted).

Plaintiffs state that the facts of the case before the court should lead to a different result than that in *Titanium Metals*.  First, according to Plaintiffs, the nature of the uranium industry compels the conclusion that TIB entries are entered for consumption.  An importer or utility consigns a given quantity of uranium to a processor, who then contracts with a  party arranging for processing for an amount of uranium processed to agreed-upon specifications.  Plaintiffs note that "[t]he party arranging for processing does not necessarily receive–nor does it expect to receive–the processed version of the very same molecules of uranium that it had previously consigned to the processor." *Pls.' Mem*. at 37.  Thus, Plaintiffs claim, when the Kazakh-origin uranium is entered under TIB, it is highly likely that the actual uranium molecules will be delivered to a utility in the United States.  Therefore, "it is clear that TIB entries of Kazakhstan-origin uranium are entered for consumption." *Id.* at 36.  Second, Plaintiffs assert that because TIB entries of Kazakh-origin uranium are entered for consumption, "the Department's decision not to include TIB entries within the scope of its investigation and any future order is contrary to Congressional intent that the Department issue effective antidumping orders." *Id.* at 37.

USEC attempts to distinguish the facts of this case from *Titanium Metals*, but fails to convince the court of significant differences between the facts of this case and those of *Titanium Metals*. First, Plaintiffs argue, no allegations or discussions of circumvention were made in *Titanium Metals*; in this case the Department was well-aware of the potential for circumvention of the antidumping duty orders, as evidenced by the *Suspension Agreement*. Second, Plaintiffs make note of an internal Department memorandum recognizing that uranium swaps were inconsistent with the purpose of the *Suspension Agreement*. *See id.* at 38. Finally, Plaintiffs emphasize that the Department did not specifically deny that TIB entries should be included within the scope of the investigation and any resulting antidumping order to prevent circumvention. *See id.* Rather, Commerce merely repeated its prior finding that merchandise entered pursuant to TIB is not entered for consumption. *See id.*

Plaintiffs are correct in that the *Titanium Metals* court elected not to consider whether TIB entries should be subject to the antidumping laws in order to prevent circumvention. However, the court did indicate its awareness of the potential for circumvention, determining that the circumvention issue was relevant to the particular set of facts before the court "only to the extent that it relates to statutory interpretation." *Titanium Metals*, 19 CIT 1148, 901 F. Supp. at 366. Furthermore, the court agrees with Defendant that the court in *Titanium Metals* did consider the question of whether TIB entries should be subject to the antidumping laws. The court correctly found that the phrase "entered for consumption" was ambiguous; therefore, the court would not infer legislative intent in the face of Commerce's reasonable interpretation of the language. *See id.*

Plaintiffs base their argument that the Department failed to act in accordance with law on an assumption that the TIB entries of Kazakh-origin uranium are "entered for consumption" within the

meaning of the regulation because they may be processed along with other sources of uranium prior to re-export. First, there is no clear legislative intent with regard to what falls into the "entered for consumption" category. Second, the facts of this case are not significantly different from those in *Titanium Metals*, so as to render the court's reasoning invalid with regard to the issue of what products should be considered "entered for consumption." Even if Plaintiffs were correct that the Department recognized the potential for circumvention in this case but not in *Titanium Metals*, mere recognition of the potential for circumvention does not mean that the Department behaved contrary to legislative intent by rejecting the Coalition's request to include TIB entries within the scope of the antidumping duty order. As the court stated in *Titanium Metals*, "[t]o sustain [an agency's] application of [a] statutory term, [a court] need not find that its construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Id.*, 19 CIT at1149, 901 F. Supp. at 366 (quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445 (1978)(citations omitted)).

## V.  CONCLUSION

For the foregoing reasons, the court holds that the Department's *Final Determination of Sales at Less Than Fair Value: Uranium From the Republic of Kazakhstan*, 64 Fed. Reg. 31179 (June 10, 1999)  is supported by substantial evidence and in accordance with law.  Therefore, the court denies Plaintiffs' *Motion for Judgment Upon the Agency Record.*  Judgment will be entered accordingly.


Dated: _____                         _____
              New York, New York                      Judith M. Barzilay
                                                                  Judge

ERRATUM

*USEC, Inc. v. United States,* Court No. 99-08-00548, Slip Op. 01-58, dated May 17, 2001.

On page 1, below the caption, on the fourth line, the words "David W. Ogden, Assistant Attorney General" should read "Stuart E. Schiffer, Acting Assistant Attorney General."


May 23, 2001